NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12678

COMMONWEALTH  vs.  JOSE RAMOS.


Hampden.     May 8, 2026. - August 13, 2026.

Present:  Budd, C.J., Gaziano, Wendlandt, Georges,
& Wolohojian, JJ.


Homicide.  Self-Defense.  Evidence, Self-defense, Prior violent
    conduct.  Practice, Criminal, Assistance of counsel,
    Instructions to jury, New trial, Capital case.
    Constitutional Law, Assistance of counsel.



    Indictment found and returned in the Superior Court
Department on April 15, 2015.

    The case was tried before Constance M. Sweeney, J., and a
motion for a new trial, filed on May 8, 2025, was considered by
Michael K. Callan, J.


    Michael Tumposky for the defendant.
    Travis H. Lynch, Assistant District Attorney, for the
Commonwealth.


    WENDLANDT, J.  After a jury trial, the defendant, Jose

Ramos, was found guilty of murder in the first degree on a

theory of deliberate premeditation for the stabbing death of

Luis Sanchez (victim).  The defendant's principal defense at trial was that he killed the victim in lawful self-defense.

In this consolidated appeal from his conviction and the denial of his motion for a new trial, the defendant contends that trial counsel was constitutionally ineffective because he failed to introduce evidence of the victim's prior violent conduct pursuant to Commonwealth v. Adjutant, 443 Mass. 649 (2005), and that the trial judge erred in failing to instruct the jury sua sponte on voluntary manslaughter by sudden combat after trial counsel withdrew a request for such an instruction. The defendant also asks us to exercise our authority under G. L. c. 278, § 33E, to order a new trial or a reduction in the verdict.  We affirm the defendant's conviction of murder in the first degree and the denial of his motion for a new trial and discern no reason to grant relief under G. L. c. 278, § 33E.

1.  Background.  a.  Facts.  We summarize the facts the jury reasonably could have found, reserving certain details for later discussion.

On the evening of March 10, 2015, the defendant went to the intake office of a shelter where he and the victim had been living and spoke with an employee (first employee) to report a conflict with the victim; he stated that the victim was drunk, "giving him a lot of attitude[,] and . . . somebody needed to speak to [the victim]."  After noticing the victim standing by

the office window, the first employee told the defendant that she or another employee would talk to the victim and that he should leave the office.  The defendant promptly left the office and headed to the basement; the victim hesitated, apparently considering entering the office, but then followed the defendant.

Surveillance video footage from the shelter showed the two men entering a dormitory in the basement.  The defendant put on a leather jacket and beckoned the victim to follow him back upstairs; the victim removed his jacket and followed the defendant.[1]

Meanwhile, the first employee instructed another shelter employee (second employee) to go to the basement to speak with both men.  As the second employee approached the stairwell the men had used to enter the basement, the defendant and the victim walked past him on their way up the stairs; the victim trailed the defendant.

Although the defendant had requested staff intervention to resolve his dispute with the victim, he did not stop to talk to the second employee, whom he passed in a "rushy . . . hustle manner."  The victim also had a "hostile" demeanor as he passed

---

[1] The video footage showed the defendant wearing dark clothes and a black leather jacket; the victim wore a red football jersey with the number twenty-one emblazoned in white on the front and back, and a black shirt underneath.

the second employee.  The second employee followed the men and saw them leave the shelter.  Upon seeing the two men leave the shelter and head toward the street, the second employee believed there was going "to be a problem."  Shelter rules prohibited fighting on the property, and residents who violated the rule were banned from the premises.[2]  Thus, residents intending to fight without being banned would go "across the street to the parking lot area."  The second employee alerted staff and a Springfield police officer assigned to the shelter (shelter officer) that a fight was going to occur outside.

Surveillance video footage captured part of the physical confrontation, which took place in the shelter's parking lot and on the adjacent street.  The video footage showed that the victim was in front of the defendant when they left the shelter. As the victim walked toward the adjacent street with his back to the defendant and his arms by his side, the defendant suddenly quickened his pace and closed the gap between them; lunging at the victim, the defendant raised his arm in a forward slashing movement, inferably stabbing the victim in the back.  The victim fell to the ground.

At this point, the video footage did not capture the actions of the two men while they were out of the video frame

_____

[2] Residents are informed of the shelter rules on intake.

for roughly fifteen seconds.  A woman who was visiting the shelter the evening of the stabbing witnessed the fight; she testified that she saw the defendant make upward punching gestures at the victim, who was standing again.  The victim was unarmed and did not otherwise attack the defendant.  The visitor also did not see a weapon in the defendant's hands, although she saw that the victim was bleeding after the men separated.

When the men moved back into the frame of the surveillance video footage, the defendant was walking away from the victim and toward the shelter; the victim briefly moved toward the defendant in a jumping motion before falling behind, taking off his jersey and black undershirt, and stumbling to the ground. Subsequent forensic examination of the victim's jersey and undershirt revealed cuts in both shirts matching the wounds on the victim's body; in short, he was stabbed while wearing both shirts.

By the time the two shelter employees and the shelter officer reached the parking lot, the fight had concluded; they saw the victim staggering and bleeding heavily from the abdomen before collapsing.  The defendant was holding a knife, which he dropped upon the shelter officer's command.  Police officers later recovered a green-handled knife from the crime scene; the knife contained the victim's deoxyribonucleic acid and matched the green sheath found in the pocket of the defendant's jacket.

Police officers also recovered a yellow- and gray-handled screwdriver from the crime scene; the screwdriver tested positive for occult blood.

The shelter officer asked the second employee to watch the defendant while he attended to the victim, who had suffered four stab wounds to the chest, torso, and back. While the victim was receiving medical attention, the defendant sat near the shelter entrance and smoked a cigarette. The defendant was uninjured from the altercation. The defendant's jacket had some damage on the right front panel and left sleeve, but the cause of the damage was unclear and none of the tears penetrated through the interior lining of the jacket.

When police officers approached the defendant to arrest him, he "casually, [and] nonchalant[ly]" took a final puff of his cigarette, stood up, extinguished the cigarette, and turned around, placing his hands behind his back to be handcuffed without any direction to do so by the arresting officers. When the officers asked the defendant if he had any weapons, the defendant responded that he was unarmed because he had already dropped the knife. As the officers escorted the defendant to the police cruiser, they walked past the victim's body; the defendant spontaneously remarked, "[T]hat guy's dangerous. He always carried knives. I don't feel bad about it."

The victim was later transported to the hospital, where he died.  The medical examiner concluded that the cause of death was multiple sharp-force injuries.  The victim's injuries included one stab wound to the back that probed from back to front and slightly upwards; two stab wounds to the chest that penetrated the heart; and one stab wound to the torso that punctured the lung and stomach.

b.  Self-defense.  At trial, the defendant did not contest that he had stabbed the victim; instead, he contended that the victim was the first person to use deadly force.  Specifically, he claimed that the victim attacked the defendant with a screwdriver and that the defendant acted in self-defense.

The defense rested primarily on the testimony of a shelter resident who testified that he saw the defendant and the victim engaged in a pushing and screaming match in the parking lot.  He saw the victim "pull[] a red-and-clear-handled screwdriver out from his back and [come] around and [swing] it at" the defendant, prompting the defendant to strike back.[3]  The resident testified that the victim started swinging the screwdriver at

---

[3] The jury were presented with conflicting evidence of the resident's view of the defendant's weapon.  One month after the stabbing, the resident told the police, upon being presented with a photograph of the green knife recovered from the crime scene, that it was the weapon he observed the defendant using against the victim.  However, at trial the resident testified that he did not see the green-handled knife in the defendant's hands.

the defendant after he removed his jersey and undershirt. As discussed, the surveillance video footage contradicted this testimony; it showed the victim collapsing to the ground and remaining on the ground immediately after removing his clothing. Further, when presented with photographs of the yellow- and gray-handled screwdriver that police officers had recovered from the shelter parking lot on the day of the stabbing and that tested positive for occult blood, the resident testified that it was not the screwdriver he had seen the victim use.

At the close of evidence, the trial judge conducted a charge conference during which the defendant's trial counsel withdrew his request for a voluntary manslaughter by sudden combat instruction, explaining that the case law showed the instruction was unwarranted under the circumstances.[4] The jury were instructed on the law of self-defense, murder in the first degree by deliberate premeditation and extreme atrocity or cruelty, murder in the second degree, and voluntary manslaughter by excessive use of force in self-defense and reasonable provocation.

---

[4] Specifically, trial counsel said that he believed there was a case that foreclosed the availability of a voluntary manslaughter by sudden combat instruction and the judge agreed, noting that she had read the same case in connection with another trial. Neither counsel nor the trial judge specified the referenced case.

On April 12, 2018, the jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation.  The defendant timely appealed.

c.  <u>Motion for a new trial</u>.  In May 2025, the defendant filed a motion for a new trial, which we remitted to the trial court.  In his motion, the defendant argued that his trial counsel was constitutionally ineffective for failing to introduce <u>Adjutant</u> evidence, including the victim's two 2010 convictions of rape of a child, G. L. c. 265, § 23; three 2010 convictions of indecent assault and battery on a child under fourteen, G. L. c. 265, § 13B; 2009 conviction of resisting arrest, G. L. c. 268, § 32B;[5] and 2007 conviction of assault and battery, G. L. c. 265, § 13A.  The defendant maintained that this evidence would have bolstered his defense that the victim was the first to use deadly force.

In connection with the motion, trial counsel provided an affidavit, in which he averred in relevant part:

"Based on my review of the discovery, including the surveillance video of the altercation, it is and was my opinion that there was no issue as to who the first aggressor in this altercation was. . . .  Additionally, based on the information I had relating to [the defendant's] and [the victim's] records of violent offenses, [the defendant] had a more significant record for

---

[5] While the victim was not charged with assault and battery on a police officer, the defendant argues that the police report for the resisting arrest charge to which the victim pleaded guilty shows that the victim's conduct constituted assault and battery on a police officer.

> violence. [The defendant] had a number of convictions for
> assault and battery, including assault and battery by means
> of a dangerous weapon . . . . [The defendant] also had a
> number of assault and battery cases that were
> dismissed. . . . If the court had allowed [the defendant]
> to introduce [the victim's] record for violence, it would
> have opened the door to allow the Commonwealth to introduce
> [the defendant's] record for violence. It is/was my
> opinion that this strategy would not have advanced [the
> defendant's] interests."

The defendant's prior violent acts included a 2013 conviction of
assault and battery, 2008 charges of assault and battery and
breaking and entering in the nighttime with intent to commit a
felony that were dismissed, and 2001 convictions of assault by
means of a dangerous weapon and assault and battery by means of
a dangerous weapon.

The motion judge, who was not the trial judge (the trial
judge having retired), denied the motion without an evidentiary
hearing, concluding that trial counsel's tactical decision not
to introduce Adjutant evidence was not manifestly unreasonable
as that evidence provided "little support for the notion that
[the] victim had a propensity to be the first aggressor" and
would have permitted the Commonwealth to introduce the
defendant's prior violent conduct. The motion judge also
questioned whether the trial judge would have allowed the
admission of the victim's child sexual assault convictions, as
those offenses were "markedly dissimilar to his alleged conduct
here -- escalating a fist fight into a lethal encounter by

attempting to stab his opponent with a screwdriver." The defendant timely appealed from the denial of his motion, and that appeal was consolidated with his direct appeal.[6]

2. Discussion. a. Ineffective assistance of counsel. i. Adjutant evidence. "Evidence of prior bad acts is generally inadmissible to show a defendant's propensity to commit a crime." Commonwealth v. Don, 483 Mass. 697, 713 (2019). In Adjutant, we carved a narrow exception to this rule; we determined that "where the identity of the first aggressor[7] is in dispute and the victim has a history of violence, . . . the trial judge has the discretion to admit evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense." Adjutant, 443 Mass. at 664. The jury may infer based on such evidence that "the victim and not the defendant

---

[6] In May 2020, the defendant filed a G. L. c. 278A motion, the denial of which we reversed on appeal. See Commonwealth v. Ramos, 490 Mass. 818, 819 (2022). The defendant has not filed a motion for a new trial based on the results of the requested scientific testing.

[7] Pertinent here, "the term 'first aggressor' is not limited to the person who provokes or initiates a nondeadly assault"; it may also refer to the individual who "escalated the potential for violence through the use or threat of deadly force." Commonwealth v. Deconinck, 480 Mass. 254, 263 (2018), citing Commonwealth v. Chambers, 465 Mass. 520, 529-530 (2013). See Chambers, supra at 530 (victim's prior bad acts are admissible where "the initiator of the nondeadly assault is known, [but] it is disputed whether the victim or the defendant was the first to use or threaten deadly force").

was likely to have been the first aggressor because . . . the victim acted in conformance with his character for violence on the occasion in question" (quotations and citation omitted). Commonwealth v. Souza, 492 Mass. 615, 621 (2023).

Because the purpose of admitting Adjutant evidence is to provide the jury with "as complete a picture of the (often fatal) altercation as possible before deciding on the defendant's guilt," the judge may "admit not only evidence of the victim's prior acts of violence, but also 'evidence (if it exists) of specific violent acts of the defendant.'" Commonwealth v. Rateree, 495 Mass. 610, 619 (2025), quoting Commonwealth v. Morales, 464 Mass. 302, 310 (2013). "In deciding whether to admit evidence concerning prior acts of violence by the victim and more particularly by the defendant . . . , the judge must carefully examine the particular circumstances of the case and weigh the probative value of such evidence against its prejudicial effect." Morales, supra at 312 n.16. If the trial judge admits evidence of prior violent conduct, he or she must instruct the jury that they may consider the evidence only for the limited purpose of evaluating the defendant's disputed self-defense claim. See id. at 310-311; Adjutant, 443 Mass. at 663-664.

ii. Standard of review. "Because the motion judge did not preside over the trial or conduct an evidentiary hearing, and

the only relevant evidence submitted . . . consisted of affidavits and other documentary evidence, we review the denial of the motion for a new trial de novo." Commonwealth v. Mazza, 484 Mass. 539, 547 (2020). "In reviewing a defendant's claim of ineffective assistance of counsel in a case of murder in the first degree, we do not evaluate the claim under the traditional standard set forth in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974)." Commonwealth v. Noguera, 496 Mass. 601, 610 (2025). "Instead, we apply the more favorable standard of G. L. c. 278, § 33E, and review the defendant's claim for a substantial likelihood of a miscarriage of justice" (citation omitted). Id. "Under this standard, we first ask whether defense counsel committed an error in the course of trial, and if there was error, we ask whether it was likely to have influenced the jury's conclusion" (quotations and citation omitted). Id.

"Where a claim of error is based on a tactical or strategic decision by trial counsel, rather than an omission or mistake, an attorney's decision is only ineffective if it was manifestly unreasonable" (quotation and citation omitted). Commonwealth v. Robinson, 493 Mass. 775, 789 (2024). "Manifestly unreasonable decisions are those 'which lawyers of ordinary training and skill in criminal law would not consider competent.'" Id. at 789-790, quoting Commonwealth v. Ayala, 481 Mass. 46, 62 (2018).

iii.  Reasonableness.  Here, trial counsel averred that he declined to introduce Adjutant evidence of the victim's prior violent conduct because he believed that doing so would have opened the door to the admission of the defendant's prior violent conduct, which, in counsel's estimation, would have revealed to the jury that the defendant had a greater propensity for violence than the victim.  Trial counsel's strategic decision was not manifestly unreasonable.

To begin, the acts underlying the victim's child sexual assault convictions, although perhaps indicative of violent behavior in general, had minimal probative value to show that the victim was likely to have been the first to employ deadly force.  See Commonwealth v. Deconinck, 480 Mass. 254, 267 (2018) ("judge did not abuse her discretion in finding that the violation of the restraining order did not tend to show that the victim was the initial aggressor" as it was "different in nature from the knife fight"); Commonwealth v. Gaynor, 73 Mass. App. Ct. 71, 75-76 (2008) (judge would not have abused discretion in declining to admit Adjutant evidence where prior incidents of domestic violence "were different in nature from the incident underlying the offense, a street fight, and they were separated in time from the charged offense by approximately four years").  And the prejudicial effect of the child sexual assault convictions may have outweighed their minimal probative value.

Cf. Commonwealth v. Peno, 485 Mass. 378, 398-399 (2020) ("[an] equally fundamental concern resulting from the piling on of impermissible prior bad act evidence, particularly involving a young child and a brutal crime, is that the . . . evidence . . . could so inflame the jury's passion or sympathy that they would be unable to remain impartial").

Even assuming, arguendo, that the trial judge would have allowed the Adjutant evidence of the victim's prior violent conduct to be admitted, trial counsel's decision to forgo it because it would open the door to the introduction of the defendant's prior convictions was not manifestly unreasonable.[8] The defendant's theory of self-defense rested on whether he or the victim was the first to use a deadly weapon, and the Adjutant evidence at issue showed that the defendant was the only one of the two men with a conviction of assault and battery

_____

[8] The defendant also argued that trial counsel's averment that he declined to introduce Adjutant evidence because he believed there was "no issue as to who the first aggressor in this altercation was" showed that counsel's decision was predicated on a lack of understanding of the law -- specifically, that Adjutant applies where the defendant started the fight but the victim was the first to introduce lethal force -- and that therefore his decision was manifestly unreasonable. Because trial counsel also averred that he predicated his decision on his estimation that any positive effect of Adjutant evidence would be outweighed by the prejudicial effect of counter-Adjutant evidence, and we conclude that that rationale was not manifestly unreasonable, we do not reach the defendant's additional argument.

by means of a dangerous weapon.[9]  See Commonwealth v. Kirkland,
491 Mass. 339, 348-349 (2023) (decision not to call witness not
manifestly unreasonable where counsel believed witness could
"open up Pandora's box" as she "knew details that could really
hurt [the] defense"); Commonwealth v. Teixeira, 486 Mass. 617,
638 (2021) (decision "not to a call a witness whose testimony
counsel felt might . . . harm his client's case . . . is not
manifestly unreasonable"); Commonwealth v. Thompson, 431 Mass.
108, 121, cert. denied, 531 U.S. 864 (2000) (decision not to
present evidence that "was as potentially inculpatory as it was
exculpatory" was reasonable tactical decision).  Thus, the
motion judge did not abuse his discretion in denying the
defendant's motion.[10]  See Kirkland, supra at 349 ("we cannot say

---

[9] Although the defendant asserts that the Commonwealth would
have been unable to introduce in evidence his 2001 assault and
assault and battery by means of a dangerous weapon convictions
because the Superior Court destroyed the 2001 records, the
Commonwealth averred that it retained its file of the case.  The
defendant's further assertion that the Commonwealth would have
been unable to present a witness to prove the defendant's
violent conduct in the 2008 case for assault and battery lacks
factual support.  See Commonwealth v. Marinho, 464 Mass. 115,
123 (2013) ("A defendant bears the burden of proof on a motion
for a new trial").

[10] To the extent that the defendant argues that admission of
Adjutant evidence could have supported a manslaughter verdict,
he is wrong.  The jury may consider Adjutant evidence for the
limited purpose of assessing a defendant's disputed self-defense
claim.  See Morales, 464 Mass. at 311 n.14 ("with respect to
evidence of prior specific acts of violence by the victim and
the defendant, the limiting instruction [delineating that
evidence may only be used to assess a self-defense claim] should

that trial counsel's decision was manifestly unreasonable" and that trial counsel was therefore ineffective where "we can ascertain counsel's strategic and tactical reasons" behind decision).

b. Voluntary manslaughter by sudden combat. The defendant next contends that he was entitled to an instruction on voluntary manslaughter by sudden combat and that the trial judge's failure to give the instruction sua sponte created a substantial likelihood of a miscarriage of justice. In particular, he maintains that the evidence, including the shelter resident's testimony, the damage to the exterior of the defendant's jacket, and the presence of occult blood on the screwdriver recovered from the crime scene, when viewed in the light most favorable to him, showed that the victim struck the defendant with a screwdriver first and that, accordingly, he was entitled to a sudden combat instruction. We disagree.

"A manslaughter instruction is required if the evidence, considered in a light most favorable to the defendant, would permit a verdict of manslaughter rather than murder." Commonwealth v. Howard, 479 Mass. 52, 57 (2018). "Voluntary

---

be given both during trial, when the evidence is admitted, and during the judge's final charge"). See also Commonwealth v. Webster, 480 Mass. 161, 171 (2018) ("The jury are presumed to have followed jury instructions" [quotation and citation omitted]).

manslaughter is [an unlawful] killing committed in a sudden transport of heat of passion or heat of blood, upon reasonable provocation and without malice, or upon sudden combat" (quotation and citation omitted).  Id.

We have described the type of altercation that may constitute sudden combat as follows:

> "When two meet, not intending to quarrel, and angry words suddenly arise, and a conflict springs up in which blows are given on both sides, without much regard to who is the assailant, it is a mutual combat.  And if no unfair advantage is taken in the outset, and the occasion is not sought for the purpose of gratifying malice, and one seizes a weapon and strikes a deadly blow, it is regarded as homicide in heat of blood . . . ."

Commonwealth v. Poum, 496 Mass. 267, 274 (2025), quoting Commonwealth v. Webster, 5 Cush. 295, 308 (1850).  "Generally, to warrant a sudden combat instruction the 'victim . . . must attack the defendant or at least strike a blow against the defendant.'"  Poum, supra, quoting Commonwealth v. Espada, 450 Mass. 687, 696-697 (2008).  And even if "there is physical contact between a defendant and a victim[, it] is not always sufficient to warrant a manslaughter instruction" (quotation and citation omitted).  Espada, supra at 697.  At bottom, "[t]here must be evidence that would warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection

or restraint, and that what happened actually did produce such a state of mind in the defendant" (citation omitted).  Howard, 479 Mass. at 59 n.7.

Viewed in the light most favorable to the defendant, the evidence did not warrant a sudden combat instruction.  Far from a meeting of individuals "not intending to quarrel" during which angry words "suddenly arise" and a conflict "springs up" (citation omitted), Poum, 496 Mass. at 274, the evidence at trial was that the defendant and the victim had a preexisting dispute, the defendant reported the conflict to shelter staff, and staff assured the defendant that someone would come down to the basement to resolve the matter between him and the victim.  Rather than wait for the promised mediator, upon arriving in the basement the defendant donned a jacket containing a knife and beckoned the victim to follow him outside.  On their way to the planned rumble, the two men passed at least one other shelter employee; they did not seek assistance from him.  Instead, the two men briskly walked past the employee in such a manner as to cause the employee to understand that the men were going to engage in a physical altercation in the street where shelter residents would fight in order to avoid the consequence of being banned from the shelter.  The central dispute at trial was whether the defendant or the victim was the first to employ deadly force, not whether the men decided to fight; indeed,

trial counsel told the jury that the undisputed evidence was that the men "went outside to have a fist fight."  In sum, the evidence did not support the inference that the defendant was in "a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint" (citation omitted).  Howard, 479 Mass. at 59 n.7.

To be sure, the shelter resident testified that, when the defendant and the victim were outside the shelter, he observed the defendant and victim yelling and pushing at each other before the victim pulled out a screwdriver and swung it at the defendant.  This testimony, however, does not contradict the evidence that there was nothing "sudden" about the altercation between these combatants.  Specifically, the resident's testimony had no bearing on the evidence showing that the defendant and the victim had a preexisting conflict, that the defendant put on a jacket containing the murder weapon before beckoning the victim to follow him, that both men left the building in a manner that made it apparent to shelter staff that they were going to fight, and that the defendant ambushed the victim from behind.  See Poum, 496 Mass. at 275 (fact that defendant brought weapon with him weighed against sudden combat); Commonwealth v. Miranda, 492 Mass. 301, 308 (2023) (sudden combat instruction not warranted in part because

defendant, who followed victim around building before striking fatal blow, had time to regain self-control).

Nor does the evidence support the requirement that "no unfair advantage [was] taken [at] the outset" (citation omitted). Poum, 496 Mass. at 274. Instead, the surveillance video footage showed that as the men left the shelter, the victim walked ahead of the defendant at such a pace that a distance was created between the two, and that as the victim's back was turned, the defendant suddenly quickened his pace to close the gap between them and then raised his arm above his head and brought it down on the victim's backside in a slashing motion. The victim fell to the ground thereafter. Nothing in the resident's testimony that the men were yelling at each other before the victim began swinging a screwdriver at the defendant contests the captured footage showing the defendant striking the victim as the victim was walking away with his back to the defendant.

In these circumstances, the trial judge was not required to give a sudden combat instruction sua sponte after trial counsel specifically withdrew his request for it. See Commonwealth v. Waller, 486 Mass. 72, 76 (2020) ("judge did not abuse his discretion by deciding to abide by the defendant's request not to provide the self-defense instruction"); id. at 75 ("judge has no obligation to instruct [on self-defense] when neither party

requests [the instruction], because doing so may interfere[] with the defendants' right to present their chosen defenses" [quotation and citation omitted]); Commonwealth v. Acevedo, 446 Mass. 435, 442 n.12 (2006) (judge not required to sua sponte instruct jury on reasonable provocation); Commonwealth v. Berry, 431 Mass. 326, 337 (2000) ("[w]hen the evidence permits a finding of a lesser included offense, a judge must, upon request, instruct the jury on the possibility of conviction of the lesser crime" [citation omitted; emphasis in original]).

3. Conclusion. For the foregoing reasons, we conclude that trial counsel was not constitutionally ineffective for not introducing Adjutant evidence and that the trial judge did not err in failing to instruct the jury on voluntary manslaughter by sudden combat. Further, after careful review of the entire record, we conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the verdict. We therefore affirm the conviction and the denial of the motion for a new trial.

So ordered.